UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                     :

CITY OF OURO PRETO, on behalf of itself     :
and all others similarly situated,

                                     :

                Plaintiff,        :

                                     :

           -v-               :           23 Civ. 8139 (JPC)

                                     :

MERRILL LYNCH, PIERCE, FENNER & SMITH INC., :      OPINION AND ORDER
*et al.*,

                                     :

                Defendants.     :

                                     :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      This case concerns allegations of devastating environmental and humanitarian consequences arising from mining operations in the state of Minas Gerais, Brazil. Plaintiff City of Ouro Preto, purporting to represent a putative class of Brazilian municipalities, seeks to hold Defendants Merrill Lynch, Pierce, Fenner & Smith Inc., Barclays Capital, Inc., Citibank Inc., Citigroup Global Markets, Inc., JP Morgan, and JP Morgan Securities LLC[1]—affiliates of four global financial institutions with offices in New York—strictly liable under Brazilian law for harms caused by the imminent collapse of dams holding toxic byproducts of the mining process. These dams are owned and operated by Vale S.A. ("Vale"), a Brazilian company in which Defendants allegedly have invested and whose activities Defendants allegedly have financed. Before the Court is Defendants' joint motion to dismiss on forum non conveniens grounds. For the reasons provided below, the Court grants the motion.

---

[1] Defendants assert that "JP Morgan" and "Citibank Inc." do not exist. Dkt. 58 ("Motion") at 2 n.1.

# I.  Background

This case is related to *Antônio Pereira Association v. Merrill Lynch*, *Pierce, Fenner & Smith, Inc.*, No. 23 Civ. 8160 (JPC) (S.D.N.Y.) (the "Pereira Matter"), in which two Brazilian residents' associations in Minas Gerais, the Antônio Pereira Association and the Pasárgada Association, purporting to represent a putative class of community associations in the same region, bring much the same claims against the same Defendants, who also have moved to dismiss that action on forum non conveniens grounds.  *Compare* Dkt. 1 ("Ouro Preto Compl."), *with* Pereira Matter, Dkt. 1 ("Pereira Compl."); *see also* Pereira Matter, Dkt. 85 (Defendants' motion to dismiss).  As the two cases entail the same considerations with respect to the forum non conveniens inquiry, with the briefing on the issue all but identical, the Court addresses the actions together.

## A.    Facts[2]

These matters concern the environmental devastation resulting from Vale's mining operations in Brazil, particularly within the 7,000-square-kilometer area in Minas Gerais known as the "Iron Quadrangle."  Ouro Preto Compl. ¶ 12; Pereira Compl. ¶ 12.  Home to over four million people, the Iron Quadrangle hosts one of the largest concentrations of iron ore deposits in the world.  Ouro Preto Compl. ¶¶ 69-70; Pereira Compl. ¶¶ 72-73.  In 2018, Vale produced over 380 million metric tons of iron ore, a significant amount of which came from the Iron Quadrangle.  Ouro Preto Compl. ¶ 71; Pereira Compl. ¶ 74.

As part of its operations, Vale creates dams to hold the toxic waste byproducts (the waste stream is known as "tailings") from its mining.  Ouro Preto Compl. ¶¶ 73-74; Pereira Compl. ¶¶ 76-77.  There are various methods for constructing a tailings dam, with the security of the

---

[2] The following facts are derived from the Complaints in both actions.  *See Palacios v. The Coca-Cola Co.*, 757 F. Supp. 2d 347, 349 n.2, 350 (S.D.N.Y. 2010), *aff'd*, 499 F. App'x 54 (2d Cir. 2012).

method increasing with its cost.  Ouro Preto Compl. ¶¶ 76-77; Pereira Compl. ¶¶ 79-80.  The significant risks associated with the cheapest, least stable method of constructing tailings dams—that is, with an "upstream design," in which dried out tailings are used as the foundation for a series of embankments—have been documented for decades in popular and academic literature.  Ouro Preto Compl. ¶¶ 80-84; Pereira Compl. ¶¶ 83-87.  Indeed, Vale dams constructed with an upstream design failed in the 2015 "Mariana dam disaster," which led to the displacement of hundreds of people, as well as in the 2019 "Brumadinho dam disaster," which resulted in the deaths of over 250 people.  *See* Ouro Preto Compl. ¶¶ 86, 95-109; Pereira Compl. ¶¶ 89, 98-112.  Although Vale announced the decommissioning of all its upstream tailings dams in 2019, as of September 2023 (when Plaintiffs filed these actions), only forty percent of those dams had been decommissioned.  Ouro Preto Compl. ¶ 87; Pereira Compl. ¶ 90.

Vale owns and operates ten tailings dams in Ouro Preto, six of which are at risk of imminent collapse: Dique de Pedra, Doutor, Forquilha I, Forquilha II, Forquilha III, and Grupo.  Ouro Preto Compl. ¶¶ 151-152 (explaining that Vale classifies these six dams as "High Risk"); Pereira Compl. ¶¶ 154-155 (same).  The latter five employ an upstream design.  Ouro Preto Compl. ¶ 165; Pereira Compl. ¶ 173.  Across the two actions, Plaintiffs allege that the evacuation processes arising from the risk of these dams' imminent collapses have disrupted the lives not only of the Ouro Preto citizens who have been forcibly displaced but also of those still living nearby in fear of imminent dam failure; many also are suffering the consequences of the precipitous drop of the values of their properties.  *See* Ouro Preto Compl. ¶¶ 152, 153, 158; Pereira Compl. ¶¶ 155, 156, 159.  As alleged, Ouro Preto and other affected municipalities have incurred significant costs to prepare for prospective dam ruptures and to repair their communities, including through environmental restoration efforts and the provision of public amenities and health services.  *See* Ouro Preto

Compl. ¶¶ 156-163, 196-201, 206.  And as further alleged in the Pereira Matter, members of the residents' associations have been forced to stay in the affected regions due to economic constraints, and continue to be afflicted by air and noise pollution, as well as food, water, and healthcare insecurity.  Pereira Compl. ¶¶ 205-217.

Plaintiffs claim that responsibility for these harms lies in part with Defendants, a group of financial institutions headquartered or otherwise operating in the United States.  Ouro Preto Compl. ¶¶ 15, 28-31; Pereira Compl. ¶¶ 15, 29-32.  As alleged, Defendants have loaned Vale amounts totaling over $17 billion, continue to offer financing to Vale for its mining activities in Brazil, and profit from these activities through the substantial equity in Vale that they maintain. Ouro Preto Compl. ¶¶ 24-26; Pereira Compl. ¶¶ 25-27.  Plaintiffs assert that Defendants were aware or should have been aware of the significant health, safety, and environmental risks associated with Vale's operations of its mines and tailings dams from 2012 onward.  Ouro Preto Compl. ¶¶ 170-175; Pereira Compl. ¶¶ 178-183.  In levying that charge, Plaintiffs point to the Forms 20-F that Vale filed with the Securities and Exchange Commission (the "SEC") in April 2012, 2019, and 2023, all of which expressly disclose the risks of environmental damage, personal injury, and death arising from Vale's business.  Ouro Preto Compl. ¶¶ 170-173; Pereira Compl. ¶¶ 178-181;  *see*  Vale S.A., Annual Report (Form 20-F) at 6-7, (Apr. 17, 2012), available at https://www.sec.gov/Archives/edgar/data/917851/000104746912004389/a2208810z 20-f.htm (last visited Sept. 28, 2024); Vale S.A., Annual Report (Form 20-F), at 31-32 (Apr. 18, 2019),  available  at  https://www.sec.gov/Archives/edgar/data/917851/000104746919002391/ a2238479z20-f.htm (last visited Sept. 28, 2024); Vale S.A., Annual Report (Form 20-F) at 21-28 (Apr.  12,  2023),  available  at  https://www.sec.gov/ix?doc=/Archives/edgar/data/917851/ 000129281423001516/valeform20f_2022.htm (last visited Sept. 28, 2024).

Plaintiffs thus seek to hold Defendants strictly liable as "indirect polluters" under Brazilian law for past and ongoing harms arising from Vale's mining activities in and near Ouro Preto. Ouro Preto Compl. ¶¶ 15-20, 61; Pereira Compl. ¶¶ 15-20, 64. As relief, Plaintiffs request two categories of damages: "moral damages," which are "related to anguish, pain and suffering," and "damage to property," which entails compensatory damages, actual damages, and lost profits. Ouro Preto Compl. ¶ 202; Pereira Compl. ¶ 218. They also seek in each action a "single award for punitive damages that is commensurate with Defendants' intentional acts that Defendants knew would cause the severe economic losses claimed in this action." Ouro Preto Compl. ¶ 195; Pereira Compl. ¶ 204.

**B.    Procedural History**

On September 14, 2023, Plaintiffs filed in their respective actions materially similar Complaints advancing strict liability claims under Brazil's National Environmental Policy Act ("NEPA") and the Brazilian Constitution. Ouro Preto Compl. ¶¶ 180-187 (NEPA claim), 188-194 (Brazilian Constitution claim); Pereira Compl. ¶¶ 188-195 (NEPA claim), 196-203 (Brazilian Constitution claim). On September 18, 2023, the City of Ouro Preto's case was assigned to the undersigned, and three days later, the undersigned accepted the Pereira Matter as related. *See* Pereira Matter, Dkt. 22 (September 19, 2023 request by Citigroup Global Markets Inc. and "the entity sued under the name Citibank Inc." for designation of relatedness). On December 18, 2023, Defendants filed a pre-motion letter proposing phased briefing to start with a motion to dismiss on forum non conveniens grounds and, if that motion is denied, to follow with motions to dismiss for lack of subject matter jurisdiction, lack of standing, and failure to state a claim. Dkt. 52. Plaintiffs consented to the proposal, Dkt. 53, which the Court adopted, Dkt. 54.

On February 23, 2024, Defendants filed their motions to dismiss the actions on forum non conveniens grounds.  Dkt. 58; Pereira Matter, Dkt. 85.  Plaintiffs opposed on May 22, 2024.  Dkt. 66 ("Opposition"); Pereira Matter, Dkt. 93.[3]  And on June 24, 2024, Defendants replied and requested oral argument.  Dkts. 69 ("Reply"), 71 (oral argument request); Pereira Matter, Dkts. 95, 97.  On July 1, 2024, Plaintiffs requested leave to file a sur-reply to respond to any arguments raised by Defendants for the first time in the Reply, including Defendants' reference to a recently filed action in Brazil's Supreme Court seeking to suspend the instant litigation, among other similar lawsuits filed outside Brazil.  Dkt. 73; Pereira Matter, Dkt. 99.  The Court granted Plaintiffs' request, and Plaintiffs filed their sur-reply on July 16, 2024.  Dkt. 77 ("Sur-Reply"); Pereira Matter, Dkt. 103.

On July 18, 2024, the Court granted Defendants' request for oral argument, Dkt. 79; Pereira Matter, Dkt. 105, and on August 30, 2024, the Court granted Plaintiffs' request for leave to file supplemental authority, Dkts. 86, 87; Pereira Matter, Dkts. 112, 113.  The Court held oral argument on September 5, 2024.  Dkt. 89 ("Tr."); Pereira Matter, Dkt. 115.

---

[3] In connection with their opposition, Plaintiffs have requested that this Court take judicial notice of the indentures and underwriting agreements between Vale and Defendants, which were publicly filed with the SEC and are referenced in the Complaint, and of the United States's Treaty with Brazil, dated December 12, 1828.  Dkt. 65 ("Pls.' Mot. for Judicial Notice"); Pereira Matter, Dkt. 92.  The request is granted.  *See United States v. Reynes*, 50 U.S. 127, 147-48 (1850) ("The treaties above mentioned . . . are historical and notorious facts, of which the court can take regular judicial notice; and reference to which is implied in the investigation before us."); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (explaining that on a motion to dismiss a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

## II.  Discussion

Under the forum non conveniens doctrine, a court may in its broad discretion dismiss a case "when an alternative forum has jurisdiction to hear [the] case, and . . . trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (internal quotation marks omitted and alterations in original).  In determining whether to dismiss a case on forum non conveniens grounds, the Court conducts a three-part analysis.  *See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 70-75 (2d Cir. 2001) (en banc); *accord Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003).  First, the court determines the degree of deference afforded to the plaintiff's choice of forum.  *Iragorri*, 274 F.3d at 73.  Second, the court considers "whether an adequate alternative forum exists."  *Id.*  Third, if such a forum exists, the court "balance[s] factors of private and public interest to decide, based on weighing the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant." *Pollux Holding*, 329 F.3d at 70.  As "[t]he central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice," *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991), dismissal under this doctrine is appropriate "only if the chosen forum is shown to be genuinely inconvenient and the selected [alternative] forum significantly preferable," *Iragorri*, 274 F.3d at 74-75.

### A.    Deference to Plaintiffs' Selected Forum

The degree of deference afforded a plaintiff's choice of forum "moves on a sliding scale depending on the degree of convenience reflected by the choice in a given case." *Norex Petroleum*

*Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir. 2005) (internal quotation marks omitted).  At one end, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States," the greater the deference afforded and the steeper the hurdle the defendant faces to prevail on its motion.  *Iragorri*, 274 F.3d at 72.  At the other end, the more the plaintiff's choice of the United States forum appears to have been "motivated by forum-shopping reasons—such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum," the less the deference afforded and, consequently, the lower the defendant's hurdle to gain dismissal.  *Id.*

Consistent with these principles, a foreign plaintiff's choice of a United States forum ordinarily receives diminished deference.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981) ("Because the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference."); *see also Norex Petroleum*, 416 F.3d at 154 ("[L]ess deference is afforded a foreign plaintiff's choice of a United States forum." (internal quotation marks omitted)).  That is because "when a foreign plaintiff chooses a [United States] forum, it 'is much less reasonable' to presume that the choice was made for convenience." *Iragorri*, 274 F.3d at 71 (quoting *Piper Aircraft Co.*, 454 U.S. at 256).

The Second Circuit has "ruled, however, that when a treaty with a foreign nation accords its nationals access to our courts equivalent to that provided American citizens, identical forum non conveniens standards must be applied to such nationals by American courts."  *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981 (2d Cir. 1993); *accord Irish Nat'l Ins. Co. v. Aer*

*Lingus Teoranta*, 739 F.2d 90, 91-92 (2d Cir. 1984) (finding that the district court's failure to apply "the same *forum non conveniens* standards that would have applied to a United States citizen" to an Irish corporation "tainted its entire holding").  In other words, where such a treaty exists, "no discount may be imposed upon [a foreign] plaintiff's initial choice" of a United States forum solely based on that plaintiff's citizenship.  *Blanco*, 997 F.2d at 981.

The United States "maintain[s] Treaties of Friendship, Commerce, and Navigation, or similar agreements, with dozens of foreign nations," many of which include clauses providing the signatory's nationals with access to United States courts on terms no less favorable than those applicable to United States citizens.  *See Alcoa S.S. Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147, 152 (2d Cir. 1980); *see id.* at 152 n.6 ("Between 1946 and 1953 alone, the United States concluded nine bilateral treaties (with China, Italy, Ireland, Uruguay, Colombia, Greece, Israel, Ethiopia and Egypt), all of which provided for access to each country's courts on a 'national treatment' basis, with eight specifying access on a most-favored-nation basis.").  The Second Circuit has determined that one such treaty, the United States's Treaty of Friendship, Commerce and Navigation with Ireland, requires courts to apply the same forum non conveniens standards to Irish nationals as to United States citizens.  *Irish Nat'l Ins. Co.*, 739 F.2d at 91-92.[4]  Under the terms of that Treaty, "[n]ationals and companies of either Party shall be accorded, within the territories of the other Party, national treatment with respect to . . . having access to the courts of justice and to administrative tribunals and agencies, in all degrees of jurisdiction, both in pursuit and in defense of their rights."

---

[4] The Second Circuit additionally considered the plaintiff's entitlement to its selected forum under the terms of the Warsaw Convention, which supplied the legal basis for the plaintiff's claim, and which permitted the plaintiff to bring its action "'before the court at the place of destination,' which, in [that] case, was New York."  *Irish Nat'l Ins. Co.*, 739 F.2d at 91 (quoting Convention for the Unification of Certain Rules Relating to International Transportation by Air (Warsaw Convention), art. 28(*1*), *opened for signature*, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, *reprinted in* 49 U.S.C. § 1502 note).

Treaty of Friendship, Commerce and Navigation, Jan. 21, 1950, United States-Ireland, art. VI(1)(c), 1 U.S.T. 785, 790-91, T.I.A.S. No. 2155, at 8. The Second Circuit reached the same determination with respect to Venezuelan nationals, *see Blanco*, 997 F.2d at 981, in light of the provision in the United States's Treaty of Peace, Friendship, Navigation and Commerce with Venezuela, outlining the countries' mutual promise

> to give their special protection to the persons and property of the citizens of each other, of all occupations, who may be in the territories subject to the jurisdiction of the one or the other, transient or dwelling therein, leaving open and free to them the Tribunals of Justice, for their judicial recourse, *on the same terms* which are usual and customary with the natives or citizens of the country in which they may be . . . .

Treaty of Peace, Friendship, Navigation, and Commerce, Jan. 20, 1836, United States-Venezuela, art. 13, 8 Stat. 466, 472 (emphasis added).

Conversely, the Second Circuit has ruled that the United States's treaty obligations under its Treaty of Friendship, Commerce, and Navigation with Liberia, do not require United States courts to treat nationals of Liberia and the United States on equal footing for purposes of the forum non conveniens analysis. *Pollux Holding*, 329 F.3d at 72. The relevant clause of that Treaty provides only that "[t]he nationals of each [country] shall enjoy freedom of access to the courts of justice of the other . . . in all degrees of jurisdiction established by law," Treaty of Friendship, Commerce, and Navigation, Aug. 8, 1938, United States-Liberia, art. I, 54 Stat. 1739, 1740, which clause the Second Circuit determined "stops well short" of guaranteeing each country's nationals access to the other's courts on the same terms afforded its own citizens, *Pollux Holding*, 329 F.3d at 72.

Here, Plaintiffs argue that their selection of this forum merits substantial deference under the United States's Treaty with Brazil. Opposition at 11-12. That treaty includes substantially the same provision as that in the United States's Treaty of Peace, Friendship, Navigation and

Commerce with Venezuela, which, as earlier mentioned, the Second Circuit has found demands the application of identical forum non conveniens standards between Venezuelan nationals and American nationals seeking to avail themselves of United States courts.  *See Blanco*, 997 F.2d at 981.  The Treaty with Brazil provides:

> Both the contracting parties promise and engage formally to give their special protection to the persons and property of the citizens and subjects of each other, of all occupations, who may be in their territories, subject to the jurisdiction of the one or the other, transient or dwelling therein, leaving open and free to them the tribunals of justice for their judicial intercourse, *on the same terms* which are usual and customary, with the natives or citizens and subjects of the country in which they may be . . . .

Treaty with Brazil, March 18, 1829, United States-Brazil, art. XII, 8 Stat. 390, 392 (emphasis added); *see also* Pls' Mot. For Judicial Notice, Exh. P (treaty).

Defendants raise two counterarguments.  First, focusing on the "who may be in their territories" language, Defendants contend that this treaty, by its express terms, extends equal access to United States courts only to Brazilian nationals located in the United States, and so has no bearing here, as Plaintiffs are not located in the United States.  Motion at 11-12; Reply at 4-5.  Relying heavily on the Honorable Brian M. Cogan's reasoning in *In re Air Crash Near Peixoto de Azeveda, Brazil, on Sept. 29, 2006 ("In re Air Crash")*, 574 F. Supp. 2d 272, 280-81 (E.D.N.Y. 2008), *aff'd*, 354 F. App'x 585 (2d Cir. 2009), Defendants maintain that the Second Circuit's treatment in *Blanco* of the largely identical clause in the United States's treaty with Venezuela constitutes mere *dictum* because there the Second Circuit affirmed the district court's dismissal of the action on forum non conveniens grounds "regardless of the degree of deference afforded" under this first step.  Reply at 5 n.4.  Indeed, Judge Cogan, considering the very treaty on which Plaintiffs here rely, concluded that "[n]othing within [the relevant] provision suggests that Brazilian plaintiffs . . . not located in the territory of the [United States], may bring suit within the latter's

courts for events that took place abroad on equal footing" with United States citizens, and thus declined to afford full deference to the foreign-citizen plaintiff's forum choice. *In re Air Crash*, 574 F. Supp. 2d at 281. Second, Defendants argue that, even if that treaty provision applies to foreign nationals located outside the United States, such application warrants at best the reduced deference accorded a non-resident United States citizen's choice of a United States forum. Motion at 12; Reply at 5. In effect, irrespective of whether the Treaty with Brazil applies to Brazilian nationals not located in the United States, Defendants urge reduced deference to Plaintiffs' selection.

This Court need not decide whether the Treaty of Brazil applies to Plaintiffs here or to what extent it is bound by the Second Circuit's jurisprudence on the issue.[5] Even assuming that the

---

[5] In any case, even if the Second Circuit's pronouncement on the treaty with Venezuela in *Blanco* is properly considered *dictum*, this Court would not be prepared at this juncture to depart from that pronouncement. Initially, Second Circuit *dictum* warrants substantial deference from this Court. *Cf. Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 209 (E.D.N.Y. 2007) ("Indeed, as a general principle, a federal district court is required to give great weight to the pronouncements of its Court of Appeals, even though those pronouncements appear by way of *dictum*."). And here that putative *dictum* is consistent with the Second Circuit's earlier interpretation of the United States's treaty with Ireland in *Irish National Insurance Company v. Aer Lingus Teoranta*. In that case, the Second Circuit reversed the district court's dismissal of the action precisely because the district court had failed to apply the same forum non conveniens standard to the plaintiff, an Irish corporation, that applies to a United States citizen. *Irish Nat'l Ins. Co.*, 739 F.2d at 92. The Second Circuit determined that the provision in the United States's Treaty of Friendship, Commerce and Navigation with Ireland, which confers national treatment to "[n]ationals and companies of either Party . . . *within the territories* of the other Party," Treaty of Friendship, Commerce and Navigation, Jan. 21, 1950, United States-Ireland, art. VI(1)(c), 1 U.S.T. 785, 790-91, T.I.A.S. No. 2155, at 8, entitled the foreign plaintiff to the same treatment accorded a United States citizen for purposes of the forum non conveniens analysis without any regard to whether that foreign plaintiff was "within the territories" of the United States—notwithstanding the provision's inclusion of what Defendants here characterize as a "textual limitation." *Irish Nat'l Ins. Co.*, 739 F.2d at 92; *see* Reply at 5 n.4. That determination, on which the outcome unquestionably hinged, also may bear on the interpretive question raised by Defendants here. Nevertheless, the Court declines to delve any deeper into this jurisprudential morass, as the debate is largely academic: As discussed further, a foreign plaintiff's residence outside the United States cuts against the plaintiff's selection of a United States forum regardless of the application of a treaty with an equal-access provision.

treaty applies, deference to Plaintiffs' selection still must be reduced.  Indeed, under *Blanco*, courts are not required, as Plaintiffs appear to suggest, to give full deference mechanically to a foreign national's selection of a United States forum where the United States is obliged by an international treaty to afford such nationals equal access to United States courts: as the *Blanco* court pronounced in no uncertain terms, courts need only apply the same standards that they would apply to a United States citizen's forum selection.  *See Blanco*, 997 F.2d at 981 ("We have ruled, however, that when a treaty with a foreign nation accords its nationals access to our courts equivalent to that provided American citizens, identical forum non conveniens standards must be applied to such nationals by American courts.").

Even a United States citizen is not automatically entitled to full deference in her choice of a United States forum.  *Cf. Pollux Holding*, 329 F.3d at 73 (explaining that "there is no inflexible rule that protects U.S. citizen or resident plaintiffs from having their causes dismissed for *forum non conveniens*").  A court "does not assign 'talismanic significance to the citizenship or residence of the parties'" in considering whether dismissal is appropriate on forum non conveniens grounds. *Id.* (quoting *Alcoa S.S. Co.*, 654 F.2d at 154).  Rather, citizenship and residency are relevant only to the extent that they "serve as a proxy for, or indication of, convenience."  *Iragorri*, 274 F.3d at 74.  Under this logic, "the selection of a U.S. forum by a U.S. citizen living abroad would be entitled to less deference than the choice of the same forum by a citizen residing in the forum." *Pollux Holding*, 329 F.3d at 73.[6]  Accordingly, even assuming that the equal-access provision in

---

[6] Plaintiffs contend that *Pollux Holding Ltd. v. Chase Manhattan Bank* is inapposite because there the Second Circuit had determined that the United States's treaty with Liberia did not afford Liberian nationals access to United States courts on the same terms as United States nationals.  *See* Opposition at 12.  But the Second Circuit went on to explain that *even assuming the treaty did apply*, the Second Circuit's "case law does not support plaintiffs' assertion that such a treaty would require that their choice of forum be afforded the same deference afforded to a U.S.

the Treaty with Brazil applies, Plaintiffs, who are not located in the United States, still are not entitled to full deference with regard to their selection of this forum.  The Court thus discounts Plaintiffs' selection of this forum as it would the selection of a United States forum by a United States citizen living abroad.

The inquiry does not stop there.  As alluded to earlier, the Second Circuit, in urging totality review under this first step, has instructed courts to consider a wide range of factors indicative both of valid considerations driving a plaintiff's forum choice—including not only "the convenience of the plaintiff's residence in relation to the chosen forum," but also "the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense"—and of impermissible considerations related to forum-shopping.  *Iragorri*, 274 F.3d at 72.

Plaintiffs maintain that they brought this action here "in no small part[] to ensure that jurisdiction over Defendants was obtained," given that "[n]early all Defendants are headquartered in this District" and that "all maintain offices in New York."  Opposition at 8-9.  Defendants counter that Plaintiffs' jurisdictional concerns appear pretextual, given "Plaintiffs' continued insistence on a New York forum after their purported jurisdictional concerns were answered" by Defendants' demonstrated willingness to enter into formal stipulations agreeing not to dispute the jurisdiction of Brazil, and that those supposed concerns thus "do not support greater deference." Reply at 4.

---

citizen bringing suit in his or her home forum," and clarified in the alternative that "the [p]laintiffs are only entitled, at best, to the lesser deference afforded a U.S. citizen living abroad who sues in a U.S. forum."  *Pollux Holding*, 329 F.3d at 73.  That latter determination speaks directly to the issue here.

Defendants' representation of their willingness to submit to the jurisdiction of Brazilian courts *after* the initiation of the instant litigation does not bear on the Court's analysis at this first step. *Norex Petroleum*, 416 F.3d at 156. At this step, the Court considers only whether Plaintiffs' incipient decision to bring suit here "was motivated by genuine jurisdictional convenience," and not whether Plaintiffs' continued insistence on maintaining its suit is similarly motivated by such convenience. *Id.* Discerning no basis to discredit Plaintiffs' representation that jurisdictional concerns drove their selection of this forum and ascribing no nefarious forum-shopping motives to Plaintiffs in their choice to litigate here, the Court factors in the "substantial deference" that such jurisdictional concerns merit. *Id.*

But consideration of the availability of witnesses or evidence in this District shifts the balance against deference to Plaintiffs' choice. As discussed more fully *infra* II.C.1, Plaintiffs seek to hold Defendants strictly liable for alleged harms to the environment and communities in Brazil arising from the activities of a Brazilian company. With only the elements of damages (which were incurred by Brazilian plaintiffs in Brazil) and causation (which concern the activities of Vale, which is headquartered in Brazil) at issue in the litigation, most of the relevant documentary evidence and witnesses will be in Brazil, not in this District. In this regard, Plaintiffs' choice of this forum does not appear tethered to considerations of convenience.

On balance, the relevant factors under this first step warrant at least a minor reduction in deference to Plaintiffs' choice of forum, which lowers the burden imposed on Defendants to defeat Plaintiffs' selection. *See Iragorri*, 274 F.2d at 72 (explaining that "the less deference the plaintiff's choice commands . . . the easier it becomes for the defendant to succeed on a *forum non conveniens*

motion by showing that convenience would be better served by litigating in another country's courts").[7]

## B.    Adequacy of Alternative Forum

Turning to step two, the Court determines whether there is available an "adequate alternative forum" in which Plaintiffs could pursue their claims. *Id.* at 73. For the alternative forum to be both available and adequate, a defendant must be amenable to service of process in the alternative forum, and the forum must permit litigation of the subject matter of the action. *Pollux Holding*, 329 F.3d at 75. As to availability, the parties dispute whether Defendants have carried their burden of demonstrating that Brazilian courts may exercise jurisdiction over them. Opposition at 13-15; Reply at 6-8. As to adequacy, they dispute the import of purported docket congestion in Brazilian courts and limitations in discovery procedures there. Opposition at 15-19; Reply at 8-10. The Court considers each issue in turn.

First, Defendants have sufficiently demonstrated that Brazil is an available forum that would accept jurisdiction over these cases. Defendants have stipulated that, if the Court dismisses Plaintiffs' claims on forum non conveniens grounds, Defendants will not seek dismissal of those same claims on jurisdictional or service of process grounds if Plaintiffs bring them in Brazil. *See* Dkt. 59 ("Sawyer Decl."), Exh. B ("Stipulation") ¶ 1.[8] Defendants also have submitted a declaration by Francisco Rezek, a retired Justice of the Supreme Court of Brazil, who explains that under Article 22 of Brazil's 2015 Code of Civil Procedure ("CPC"), Defendants' stipulation "is sufficient to give the Brazilian courts jurisdiction to analyze and entertain [these] cases." Sawyer

---

[7] Even if full deference were accorded Plaintiffs' selection of this forum, the result would not change, given the strength of the countervailing considerations in this case.

[8] Defendants also have agreed to refrain from raising any statute of limitations defenses that arose after the filing of the Complaints, provided that Plaintiffs pursue their claims in Brazil within sixty days of the dismissals of these actions. Stipulation ¶ 2.

Decl., Exh. A ("Rezek Decl.") ¶ 89.  Brazil's putative jurisdiction over these actions is even confirmed by Plaintiffs' own expert, Professor Bruno Meyerhof Salama, who explains that, while "Brazilian law does not create *exclusive* jurisdiction over these cases," "from the standpoint of Brazilian law, United States courts and Brazilian courts have *concurrent jurisdiction* over these cases and Plaintiffs have the option to choose either the United States or Brazil as the jurisdiction for their lawsuits against Defendants."  Dkt. 68 ("Straus Decl."), Exh. A ("Salama Decl.") § 3.1 (citing CPC, arts. 21-23) (emphases added).  This is enough to demonstrate the availability of Brazil as an alternative forum.  *See Norex Petroleum*, 416 F.3d at 157 ("In urging Russia as an adequate alternative forum for [the plaintiff's] claims, [the] defendants satisfied the first prong of this test by representing that they would all submit to the jurisdiction of Russian courts in any comparable action filed against them by plaintiff."); *In re Air Crash*, 574 F. Supp. 2d at 282 ("Defendants can satisfy the first prong of the test—availability [of Brazil as an adequate alternative forum]—by agreeing to submit to the jurisdiction of the courts of the alternate forum for purposes of the present dispute.").

Neither case on which Plaintiffs rely compels a contrary conclusion.  *See* Opposition at 13-14.  In *Associação Brasileira de Medicina de Grupo v. Stryker Corporation*, the Sixth Circuit held that "a single line in [a] reply brief" representing that the defendant there "consent[ed] to jurisdiction in Brazil" was insufficient because the attorney's statement in a brief was "not evidence" and because the defendant had "provided no evidence that its consent to Brazil would be legally meaningful even if it were presented in a proper evidentiary form."  891 F.3d 615, 621 (6th Cir. 2018).  As mentioned, Defendants here have in fact proffered evidence demonstrating Defendants' agreement not to contest a Brazilian court's jurisdiction if this Court dismisses on forum non conveniens grounds, as well as the legal import of that consent.

*Machline v. National Helicopters* also is distinguishable.  There, the parties, a Brazilian plaintiff and American defendants, agreed that Brazil was not the more convenient forum for determining liability in a wrongful death action arising out of a helicopter accident in America. *Machline v. Nat'l Helicopter*, No. 94 Civ. 8456 (LBS), 1995 WL 251540, at *1 (S.D.N.Y. May 1, 1995).  So in moving to dismiss the case on forum non conveniens grounds, the defendants offered to concede to liability if and only if their motion was granted such that only the issue of damages would remain for adjudication in Brazil.  *Id.*  The Court denied the motion because, among other reasons, the question of whether a court in Brazil would accept jurisdiction in a matter where liability had already been conceded was heavily debated by the parties' respective experts and would have been "a novel [question] for the courts of Brazil."  *Id.* at *1-2.  That plainly is not the case here, where both parties' experts *agree* that courts in Brazil can exercise jurisdiction over the instant actions.  Rezek Decl. ¶ 89; Salama Decl. § 3.1.

Plaintiffs further argue that the indentures, accompanying prospectuses, and underwriting agreements between Defendants and Vale "establish that jurisdiction is most appropriate in New York, including in this District—*not* in Brazil."  Opposition at 15.  That is entirely beside the point. At this step, the Court is concerned with whether Brazil would accept jurisdiction over the cases— not whether jurisdiction is "most appropriate" there or in New York.

Second, in challenging the adequacy of Brazilian courts, Plaintiffs cite limitations in Brazil's discovery procedures and purported docket congestion plaguing courts specifically in Minas Gerais.  *Id.* at 15-19.  As an initial matter, "considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards."  *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 73 (2d Cir. 1998); *accord Blanco*, 997 F.2d at 982 ("[I]t is not the business of our courts to assume the

responsibility for supervising the integrity of the judicial system of another sovereign nation." (internal quotation marks omitted)). And "the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." *Blanco*, 997 F.2d at 982 (internal quotation marks omitted).

Plaintiffs' dissatisfaction with the breadth of discovery mechanisms available in Brazil does not compel the extraordinary finding that Brazilian courts are inadequate. "Indeed, were a forum considered inadequate merely because it did not provide for federal style discovery, few foreign forums could be considered adequate—and that is not the law." *Palacios*, 757 F. Supp. 2d at 359 (internal quotation marks and alterations omitted). Nor is there any requirement that, in light of any such purported discovery limitations, Defendants stipulate to make certain witnesses and documents available before the foreign tribunal to meet their burden of demonstrating the existence of an adequate alternative forum. *See, e.g.*, *Aenergy, S.A. v. Republic of Angola*, No. 20 Civ. 3569 (JPC), 2021 WL 1998725, at *10, 20 (S.D.N.Y. May 19, 2021) (conditioning dismissal on forum non conveniens grounds "on all Defendants agreeing to accept service in Angola and to waive the assertion of any statute of limitations defenses that may have arisen since the filing of this action," even where the plaintiff argued that a significant number of witnesses "reside in the United States").

Plaintiffs' attack on the efficiency of Brazilian courts is no more compelling. Plaintiffs contend that the "congestion plaguing Brazilian courts leave [them] wholly inadequate," insisting that statistics on courts in Minas Gerais (where Plaintiffs are located and where the alleged damages are ongoing) suggest that "it would take *decades* before [Plaintiffs'] claims [are] even considered." Opposition at 17-18. Specifically, they note that as of March 31, 2024, over four million cases were pending in Minas Gerais's state courts (where the action likely would be filed unless the Brazilian federal government becomes involved in the action, *see* Opposition at 16 n.8), with no action taken

19

in over 100 days in over 310,000 of those cases and no judgment received in nearly three million of them, 20,000 of which have been pending for over fifteen years. *Id.* at 16; Salama Decl. § 4.2.[9]

These statistics are of limited probative value.[10] As Justice Rezek notes, they represent aggregated data for both the lower courts and appellate courts and for all types of cases, rather than just public civil actions, which is how the instant cases are likely to be brought in Brazil, according to Justice Rezek. Rezek Suppl. Decl. ¶¶ 8-9; *see also* Dkt. 88 (Plaintiffs' post-argument letter explaining that their statistics regarding Brazilian courts "reflect some appellate court data"). Justice Rezek urges—and the Court agrees—that to the extent that average statistics spanning all types of actions are at all valuable, data sets tailored just to lower court judgments are more informative. Rezek Suppl. Decl. ¶¶ 12, 13; *see also id.* ¶ 9 (explaining that the aggregation of data reflecting case durations for the lower courts and the appellate courts is misleading in the context of environmental public civil actions because expedited relief is available for such actions and the effectiveness of those judgments are not automatically suspended by appeals). More narrowly tailored data (drawn from the same source on which Professor Salama relies) show an average of 3.3 years between the initiation of a case and lower court judgments in Belo Horizonte, the capital

---

[9] Professor Salama explains that if the Brazilian federal government were to become involved in these actions, they "could" be filed in the federal courts in Minas Gerais, which, according to Professor Salama, are even more inefficient. Salama Decl. § 4.2 (explaining *inter alia* that approximately nine percent of cases across both the entry-level and appellate-level federal courts have not received a judgment in over fifteen years). But, Professor Salama contends, "it is likely that the cases would be brought in state court." *Id.* The Court thus addresses the parties' arguments only with regard to the state courts in Minas Gerais.

[10] Even setting aside their limited probative value, the statistics on which Professor Salama relies do not appear to support Plaintiffs' estimate that "it would take *decades* before [Plaintiffs'] claims [are] even considered." Opposition at 17. For one, those numbers show that only 0.5% (20,000 out of four million) of cases take more than fifteen years to reach judgment. As Justice Rezek observes, these statistics further "reveal[] that the long-pending state court cases in Minas Gerais refer, almost exclusively, to criminal cases and civil proceedings brought to enforce a debt or previously issued judgment, both of which typically take much longer to resolve than [p]ublic [c]ivil [a]ctions." Dkt. 70 ("Sawyer Suppl. Decl."), Exh. A ("Rezek Suppl. Decl.") ¶ 10.

of Minas Gerais, and an average of 2.9 years between the initiation of a case and lower court judgments in Minas Gerais as a whole. *Id.* ¶¶ 13, 15. These durations do not warrant a finding that Brazilian courts are inadequate. *Compare Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1228 (3d Cir. 1995) (holding that where the average case would take fifteen-to-twenty years to resolve followed by another three-to-six years of appeals thereafter, such delay rendered the alternative forum inadequate as a matter of law), *with In re Air Crash*, 574 F. Supp. 2d at 284-85 (finding that "any delay in Brazil is sufficiently minimal, relative to the U.S." and that Brazil thus "should be considered an adequate forum" and collecting other cases which "have found Brazil to be an available and adequate forum for a variety of claims"), *and Manela v. Garantia Banking Ltd.*, 940 F. Supp. 584, 591 n.11 (S.D.N.Y. 1996) (declining to find Brazil an inadequate forum where the plaintiff urged that "it might take three years or longer for plaintiff's case to be tried there, and one year or longer for an appeal to be processed").

Accordingly, the Court finds that Defendants have sustained their burden of demonstrating the existence of an adequate alternative forum in Brazil.

## C.     Balance of Private and Public Interest Factors

At the final step, the Court weighs the relevant private and public interest factors set forth in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947). *See Pollux Holding*, 329 F.3d at 70.

### 1.     Private Interest Factors

The *Gilbert* private interest factors include: "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Iragorri*, 274 F.3d at 73-74 (quoting *Gilbert*, 330 U.S. at 508). In considering these factors, "the court should focus on the precise issues that are likely to be actually tried, taking into consideration

the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues." *Id.* at 74. The private interest factors analysis entails "comparison between the hardships [the] defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Id.*

The forum non conveniens "calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Texas*, 571 U.S. 49, 63 (2013) (internal quotation marks omitted). Indeed, "where parties contract to a so-called mandatory forum selection clause, in which they agree in advance on a forum that is exclusive of all others, the choice of forum is accorded" a "presumption of enforceability." *Aguas Lenders Recovery Grp. LLC v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009); *accord M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). In such circumstances, a court may "deem the private-interest factors to weigh entirely in favor of the preselected forum." *Atl. Marine Constr. Co.*, 571 U.S. at 64. That is because "[w]hatever 'inconvenience' [the defendant] would suffer by being forced to litigate in the contractual forum as it agreed to do was clearly foreseeable at the time of contracting," and absent a showing "that trial in the contractual forum will be so gravely difficult and inconvenient that [the defendant] will for all practical purposes be deprived of his day in court[,] . . . there is no basis for concluding that it would be unfair, unjust, or unreasonable to hold that party to his bargain." *M/S Bremen*, 407 U.S. at 17-18. In line with these principles, where parties contract merely to *permissive* forum selection clauses, which "designate[] a forum in advance, but do[] not preclude a different choice," no such presumption attaches, and the "traditional *forum non conveniens* standards articulated by the Supreme Court in *Gulf Oil Corp. v. Gilbert* apply." *Aguas Lenders*

*Recovery Grp.*, 585 F.3d at 700 (internal citation omitted); *see also Blanco*, 997 F.2d at 979-80 (applying the "normal forum non conveniens analysis" because the contract did not make the plaintiff's selected forum mandatory or exclusive).

Plaintiffs point to the forum selection clauses in the indentures and underwriting agreements between Defendants and Vale, and seemingly urge this Court to apply such a presumption in favor of the instant forum. Opposition at 20-23. This argument fails on multiple fronts.

To start, Plaintiffs cannot enforce the relied upon jurisdictional provisions in those agreements. "To determine whether a forum selection clause is valid and enforceable," a court considers whether "the claims and parties involved in the suit [are] subject to the forum selection clause." *Maersk Line A/S v. Carew*, 588 F. Supp. 3d 493, 502 (S.D.N.Y. 2022). Where, as here, a non-signatory to the relevant contract seeks to enforce such a forum selection clause, that party must "enjoy[] a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound." *Fasano v. Li*, 47 F.4th 91, 103 (2d Cir. 2022). Such a nexus may be established "where the non-signatory had an active role in the transaction between the signatories or where the non-signatory had an active role in the company that was the signatory." *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 325 (S.D.N.Y. 2017).

Here, Plaintiffs had no role in any transactions between Defendants and Vale. They do not claim to have any part or ownership in Vale. And Plaintiffs have otherwise provided no grounds for the Court to conclude that it was at all foreseeable that Plaintiffs, who are Brazilian municipalities and residents' associations, would be bound by the contracts between Defendants and Vale. Plaintiffs thus cannot enforce these forum selection clauses against Defendants.

Even if Plaintiffs could enforce the forum selection clauses, the presumption of enforceability still would not apply because they are not mandatory as to Defendants. In the various

indentures and underwriting agreements on which Plaintiffs rely, the forum selection clauses at most establish non-exclusive jurisdiction in New York for claims brought against Defendants. The indentures plainly use permissive language, providing that any action arising out of or relating to the agreements "*may* be instituted in any federal or state court in the Borough of Manhattan, The City of New York," with the further requirements that parties "submit[] to the jurisdiction" of courts in New York and refrain only from objecting to "the laying of venue" in New York. *See* Pls.' Mot. for Judicial Notice, Exh. A (Indenture among Vale Overseas Limited as Company, Companhia Vale Do Rio Doce as Guarantor, and JPMorgan Chase Bank as Trustee, dated March 8, 2002) § 1.14; *id.*, Exh. G (Indenture among Vale S.A. as Issuer and The Bank of New York Mellon as Trustee, dated September 29, 2015) § 1.14; *id.*, Exh. H (Amended and Restated Indenture among Vale Overseas Limited as Company, Vale S.A. as Guarantor, and The Bank of New York Mellon as Trustee, dated September 29, 2015) § 1.14; *id.*, Exh. J (Indenture among Vale S.A. as Issuer and The Bank of New York Mellon as Trustee, dated August 4, 2021) § 1.14; *id.*, Exh. K (Amended and Restated Indenture among Vale Overseas Limited as Company, Vale S.A. as Guarantor, and The Bank of New York Mellon as Trustee, dated August 4, 2021) § 1.14. These indentures also say nothing about forum non conveniens motions. And in the various underwriting agreements, the forum selection clauses, which come closer to carrying with them mandatory force, oblige only "the Company" (that is, Vale) to waive any objection to the convenience of a New York forum and to "submit[] to the non-exclusive jurisdiction" of any court in New York. *See id.*, Exh. M (Underwriting Agreement among Vale S.A. as Company and The Bank of New York Mellon as Trustee, dated September 29, 2015, p) § 13; *id.*, Exh. N (Underwriting Agreement among Vale S.A. as Company and The Bank of New York Mellon as Trustee, dated August 4, 2021) § 13; *id.*, Exh.

O (Underwriting Agreement among Vale S.A. as Company and The Bank of New York Mellon as Trustee, dated April 12, 2023) § 13.

These clauses fall far short of making any inconvenience associated with being forced to litigate the instant actions in this forum "clearly foreseeable at the time of contracting" to Defendants. *M/S Bremen*, 407 U.S. at 17-18. The Court thus employs the traditional forum non conveniens analysis, which centers on the precise issues that are to be tried in the two actions.

As earlier discussed, Plaintiffs seek to hold Defendants, a group of financial institutions headquartered or otherwise operating in the United States, strictly liable for the damages suffered by Brazilian municipalities and residents' associations due to mining operations in Brazil conducted by Vale, a Brazilian mining company. By Plaintiffs' account, under Brazilian law the only elements of their strict liability claims are causation and damages. Ouro Preto Compl. ¶¶ 60-61; Pereira Compl. ¶¶ 63-64. Defendants contend that on every issue underlying these elements, the relevant evidence and key witnesses lie overwhelmingly in Brazil. The Court agrees.

As to damages, Plaintiffs seek compensation exclusively for harms purportedly suffered in Brazil. Specifically, they seek—in addition to punitive damages and "moral damages" related to "anguish, pain and suffering"—compensatory damages for property damage and value loss to homes and businesses as a result of Vale's mining operations, the loss of profit incurred by businesses, and the amount required to restore and repair environmental damages. Ouro Preto Compl. ¶¶ 202-204; Pereira Compl. ¶¶ 218-220. Plaintiffs' attempts to prove these alleged damages likely will require extensive testimonial evidence from Brazilian witnesses, copious Brazilian documentary evidence, and expert examinations of dozens of locations in Brazil. As to causation, the questions of whether Vale's dams or consequent relocation efforts caused the precise harms alleged and whether Defendants' purported funding of Vale's mining operation caused those

harms also likely will be answered through evidence located in Brazil, where Vale is itself headquartered and where the alleged injuries arose.

In addition, Plaintiffs have represented that any person or municipality that "has had a claim or is presently making any claim pursuant to any other scheme of compensation or has made any claim for compensation for losses of any type because of either the Mariana (2015) or the Brumadinho (2019) dam collapse" is not "eligible to receive any compensation in this litigation," and so must be excluded from recovery. Ouro Preto Compl. ¶ 207; Pereira Compl. ¶ 222. Any information regarding the existence of, eligibility for, and participation in litigation or other compensation schemes related to these dam failures also is likely to lie in Brazil. *See* Rezek Decl. ¶¶ 81-83 (explaining that "more than 85 thousand lawsuits have been filed in Brazil in connection" with the 2015 and 2019 dam failures and describing the Renova Foundation, an indemnification system partially funded by Vale, which "directly compensate[s] individual and governmental entities, such as the municipalities" harmed by the dam collapses).

Moreover, these cases' extensive ties to evidence and witnesses located in Brazil give rise to other practical hurdles for the litigation to proceed in the Southern District of New York, including the need to "rely heavily on the accuracy of translations to assess much of the evidence," which would be a "costly, difficult endeavor" and is a relevant consideration in the forum non conveniens analysis. *Aenergy*, 2021 WL 1998725, at *18.

Plaintiffs do not deny that the above-described evidence and witnesses are in Brazil, and they concede that "evidence of Plaintiff[s'] underlying harm is in Brazil," Ouro Preto Compl. ¶ 37; Pereira Compl. ¶ 38. *See* Tr. at 19:8-9 ("There are elements of the case that obviously relate to Brazil. That's where the dams are."). Instead, they counter that key witnesses and documents are

located in New York, as "Defendants' due diligence in underwriting the funding and all decision-making relating to the funding occurred in this District."  Opposition at 23.

Initially, Plaintiffs' proposition is difficult to reconcile with the strict liability theory they advance, which, by its very definition, presumably would not turn on Defendants' due diligence or any measure of culpability, for that matter.[11]  Plaintiffs acknowledge this to a certain extent.  In outlining their claims against Defendants, Plaintiffs appear to argue that under the NEPA, as interpreted by the Superior Tribunal de Justiça ("STJ"), Brazil's highest court of appeals on non-constitutional matters, liability for environmental damage "does not require proof of culpability, but only the finding of a nexus between the injury and causation."  Ouro Preto Compl. ¶ 57; Pereira Compl. ¶ 60.  At oral argument, Plaintiffs confirmed their position that they are not required to prove Defendants' knowledge of the risks inhering in Vale's activities to hold Defendants liable as indirect polluters.  Tr. at 63:4-11.  If that is the case, then Defendants' due diligence in negotiating the financing agreements obviously does not pertain to the "precise issues that are likely to be actually tried," *Iragorri*, 274 F.3d at 74, and the location of evidence of such diligence is irrelevant.

At the same time, however, Plaintiffs also have alleged Defendants' knowledge of these risks and have urged the centrality of that knowledge to their claims.  *See* Ouro Preto Compl. ¶¶ 170-175 (section of the Complaint captioned "What Defendant Banks Knew: Vale's Admission of Its Environmental Damage to The Iron Quadrangle"); Pereira Compl. ¶¶ 178-183 (same); *see also* Ouro Preto Compl. ¶ 42 (listing under class action allegations common questions of whether "Defendants knew, or should have known, about the risks associated with Vale's mining operations in the Iron Quadrangle" and "about the potential that environmental damage could be caused, or

---

[11] To the extent that Plaintiffs are arguing that New York-based evidence is necessary to prove that Defendants provided some form of funding to Vale, the various indentures and underwriting agreements, which Plaintiffs already have obtained, speak for themselves.

has already been caused, by Vale's mining operations in the Iron Quadrangle"); Pereira Compl. ¶ 45 (same).  For instance, in arguing that the location in New York of evidence of Defendants' due diligence counsels against dismissal, Plaintiffs contend that Defendants' knowledge of the risks relates to the issues of damages and causation.  *See* Opposition at 30-31 ("The only issues remaining to be litigated are damages and causation, including whether Defendants were *aware of the serious risks* posed by Vale's operations when they originally funded (and continue to fund) the company—factors which openly favor maint[ain]ing the Action here, where Defendants' due diligence occurred and *evidence of knowledge* was established." (emphases added)).  In fact, Plaintiffs seem to suggest that Defendants' knowledge goes specifically to the issue of causation, insofar as they submit as instructive the STJ's pronouncement that:

> For the purpose of determination of the proximate cause in environmental damage cases, one who commits [the act] shall be equated with one who does nothing when he or she should act, who allows it to happen, who does not care what is being done, who is financing so that it can be done, and who benefits when others act.

Ouro Preto Compl. ¶ 58; Pereira Compl. ¶ 61.  In a similar vein, they submit an excerpt from another STJ case explaining that a government-owned bank would be held jointly and severally liable for damages "if there [was] evidence that [the bank] was even aware of serious and severe environmental harm [and] . . . has released intermediate or final disbursements to the mining project."  Ouro Preto Compl. ¶ 59; Pereira Compl. ¶ 62.[12]  And in framing their request for punitive damages, the availability of which Defendants contest, Plaintiffs seek an amount "commensurate with Defendants' intentional acts that the Defendants knew would cause the severe economic losses claimed in this action."  Ouro Preto Compl. ¶ 195; Pereira Compl. ¶ 204.

---

[12] As discussed *infra* II.C.2, Defendants contend that these cases, as well as the others cited by Plaintiffs in their Complaints, do not address whether a private bank may be held liable as an indirect polluter merely for providing general corporate financing.  *See* Motion at 21; Rezek Decl. ¶¶ 113-124.

It is thus unclear to the Court whether and to what extent Plaintiffs' claims require evidence of what Defendants knew before they purportedly financed Vale's activities.  In any event, Plaintiffs seem intent to demonstrate Defendants' knowledge of the risks through disclosures in certain public filings with the SEC and other documentary evidence, as well as logical inferences around the widespread publicity of the 2015 and 2019 dam failures.  *See* Ouro Preto Compl. ¶¶ 110-117 (allegations concerning widespread awareness of Vale's responsibility for significant environmental damages in Brazil); *id.* ¶¶ 170-175 (allegations concerning Defendants' knowledge of risk factors relating to Vale's business); *see also* Opposition at 6 ("But even without adequate due diligence, Defendants certainly understood these risks after these major environmental disasters caused directly by Vale's operations.").  Any need for such documentary evidence, much of which appears available online or otherwise capable of being electronically transmitted, does not counterbalance the mountain of evidence, including the vast number of witnesses, likely to be in Brazil.

Accordingly, the Court concludes that the location of the witnesses and evidence, as well as other practical considerations, weigh in favor of dismissal on forum non conveniens grounds.

Defendants further argue that this Court's inability to compel overseas non-party witnesses to attend a trial favors adjudication in Brazil.  Motion at 17-18; *see also* Rezek Decl. ¶ 98 ("[E]vidence gathered in Brazil directly by a foreign authority or by the parties at the foreign authority's order, constitutes illegally obtained evidence under Brazilian law.").  They identify as potential witnesses beyond the scope of this Court's subpoena power "the allegedly injured residents of the Iron Quadrangle, Brazilian regulators, Vale employees, and mining subcontractors."  Motion at 17; Reply at 15.  Although Plaintiffs challenge Defendants' lack of specificity in identifying witnesses, Opposition at 23-24, the Court finds the level of detail here

sufficient. *See Piper Aircraft Co.*, 454 U.S. at 258 (explaining that it is "not necessary" that a defendant seeking forum non conveniens dismissal "submit affidavits identifying the witnesses they would call and the testimony these witnesses would provide if the trial were held in the alternative forum" but rather need only provide "enough information to enable the District Court to balance the parties' interests").

Plaintiffs additionally argue that the testimony of Brazilian witnesses may be obtained through letters rogatory under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters. Opposition at 24-25. But Brazil has reserved its right to refuse such requests for pretrial discovery. *See* Brazil – Central Authority (Art. 2) and Practice Information, available at https://www.hcch.net/en/states/authorities/details3/?aid=992 (last visited Sept. 28, 2024). Moreover, even if such requests were granted, proceedings under the Convention still "entail[] significant amounts of time even in ordinary cases, and far more in complicated litigation such as this action." *Do Rosario Veiga v. World Meteorological Org.*, 486 F. Supp. 2d 297, 306 (S.D.N.Y. 2007). Considering these potential burdens, as well as the sheer "number of witnesses [abroad] and the preference for live testimony," *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002), the Court concludes that this factor, too, favors dismissal.

Lastly, the possibility of viewing the premises in Brazil allegedly affected by Vale's activities is evident, as Plaintiffs' claims are predicated entirely on environmental damage in and near the state of Minas Gerais. In such a case, "it would be far more feasible for [a Brazilian] court to view the . . . areas in question than for a New York court to do so." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 479 (2d Cir. 2002); *see also, e.g.*, *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984*, 809 F.2d 195, 201 (2d Cir. 1987) (explaining with respect to claims regarding an environmental disaster in India "that an Indian court would be in a better position to

direct and supervise a viewing" of the site, which could "help . . . in determining liability issues");
*Flores v. S. Peru Copper Corp.*, 253 F. Supp. 2d 510, 541 (S.D.N.Y. 2002) (finding in an action
"brought by residents of Peru to recover for damages allegedly caused in Peru by the operations of
a metals foundry and refinery in Peru" that the possibility of the view of the premises in Peru
favored dismissal). Plaintiffs' insistence that pictures alone may suffice to capture the extent of the
widespread damage does not tilt the scales on this factor. *See* Opposition at 26. In actions where
viewing the premises is appropriate, this Court need consider only whether the possibility, not the
necessity, of such viewing supports dismissal in favor of the alternate forum. Here, it does.

In sum, the Court concludes that all the private interest factors weigh in favor of adjudication
of these two actions in Brazil.

### 2.    Public Interest Factors

The *Gilbert* public interest factors include: "administrative difficulties associated with court
congestion; the unfairness of imposing jury duty on a community with no relation to the litigation;
the interest in having localized controversies decided at home; and avoiding difficult problems in
conflict of laws and the application of foreign law." *Aguinda*, 303 F.3d at 480; *see also Gilbert*,
330 U.S. at 508-09.

Here, the factor regarding administrative difficulties associated with court congestion is
neutral. While this District has one of the nation's busiest dockets, its "administration is very
efficient." *Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, 607 F.
Supp. 3d 421, 440 (S.D.N.Y. 2022). And with the sizable number of judges in this District, any
concern of judicial burden here is "of little or no present significance." *Guidi v. Inter-Cont'l Hotels
Corp.*, 224 F.3d 142, 146 n.5 (2d Cir. 2000).

The remaining factors skew in favor of dismissal. These actions, brought under Brazil's
NEPA and the Brazilian Constitution, require the application of foreign law on numerous

procedural and substantive issues.  Such issues include the application of the Brazilian statute of limitations, the availability of certain damages sought, and whether under the Brazilian Constitution municipalities may bring a foreign lawsuit without permission from Brazil's Federal Senate.  Rezek Decl. ¶¶ 103-106, 133-134, 138, 141.[13]  As to the central question presented in these two actions—whether Defendants may be held strictly liable as indirect polluters for the consequences of Vale's mining operations in the Iron Quadrangle—the parties vigorously debate the complexity of its resolution.  Plaintiffs urge that "Brazilian law makes clear that Defendants constitute indirect polluters based on their funding of Vale."  Opposition at 30.  But, as Defendants highlight, Plaintiffs have not cited any case that has held a bank or other party liable as a polluter merely for providing general corporate financing.  *See* Motion at 21.  The STJ cases that Plaintiffs do cite—which, according to Justice Rezek, are not binding—concern either (1) entities held liable as the owner of polluted property (not the financing theory asserted here) or (2) project financing by a government entity (rather than general corporate financing provided by a private entity, as Plaintiffs allege here). Rezek Decl. ¶¶ 113-124.  While this Court certainly is equipped to tackle thorny issues of foreign law, the pervasiveness of Brazilian law in the two actions and the novelty of the theories raised weigh strongly in favor of adjudication by Brazil's own courts.

For similar reasons, the "interest in having localized controversies decided at home," *Aguinda*, 303 F.3d at 480, also favors dismissal.  The issues raised in these actions bear both on

---

[13] Defendants note that the question of whether Brazilian law permits municipalities like the City of Ouro Preto to litigate outside Brazil is now the subject of a suit brought by IBRAM (Instituto Brasileiro de Mineração), a "national class entity" advocating for the defenses of the interests of the mining industry, in Brazil's Supreme Court.  Reply at 18; *see* Rezek Suppl Decl. ¶¶ 37-39; Sawyer Suppl. Decl., Exh. B (IBRAM's motion for breach of fundamental precept in Brazil's Supreme Court).  Plaintiffs counter that the IBRAM petition is meritless and thus unlikely to affect the instant action.  *See generally* Sur-Reply.  The Court sees no need consider the strength of the arguments raised in the IBRAM petition.

foreign policy considerations (insofar as accepting Plaintiffs' theory of liability may well discourage investments in Brazilian companies) and the regulation of mining activities in Brazil. Rezek Decl. ¶ 102. Plaintiffs' rejoinder that their claims "support—rather than threaten—Brazilian interests," Opposition at 33, does not detract from the strength of Brazil's interest in these actions, which involve harms allegedly incurred by Brazilian municipalities and Brazilian residents' associations directly caused by the mining activities of a Brazilian company in Brazil.

And lastly, the fundamental unfairness of imposing jury duty on a community with no relation to the litigation also weighs in favor of these actions proceeding in Brazil. *See* Ouro Preto Compl. at 1, 80 (jury demand); Pereira Compl. at 1, 84 (jury demand). Whatever the extent of Defendants' operations in New York, their connections to this District do not justify imposing upon New York citizens the burden of jury duty for a controversy from which they are far removed, *Value Partners S.A. v. Bain & Co., Inc*, No. 98 Civ. 1562 (SAS), 1998 WL 336648, at *4 (S.D.N.Y. June 22, 1998)—especially where that burden would be exacerbated by "the translation requirements . . . of testimony and documents" that would significantly lengthen the trial's duration, *Flores*, 253 F. Supp. 2d at 541.

Accordingly, as with the private interest factors, the public interest factors weigh in favor of adjudication of these two actions in Brazil.

### III.  Conclusion

In sum, although Plaintiffs' selection of this forum warrants some deference, the balance of private and public interest factors overwhelmingly tilts in favor of adjudicating this case and the Pereira Matter proceeding in Brazil, which is both an available and adequate forum. Defendants here are charged with financing and benefitting from a Brazilian company's mining activities in Brazil, and these activities are alleged to have destroyed the environment in Brazil and to have had

a devastating impact, both economically and psychologically, on communities in Brazil.  These actions belong there.

For the foregoing reasons, Defendants' motion is granted, and the Complaint is dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 57 and to close this case.

SO ORDERED.

Dated: September 30, 2024
       New York, New York

_____
                JOHN P. CRONAN
            United States District Judge